## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| *ex rel.* **STEPHANIE STRONG** | ) | |
| **BLANKENSHIP,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:19-00104-KD-N** |
| | ) | |
| **LINCARE, INC.** *and* **LINCARE** | ) | |
| **HOLDINGS, INC.,** | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

This action is before the Court on the motion to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted (Doc. 25) filed by Defendant Lincare Inc. ("Lincare"). The assigned District Judge has referred said motion to the undersigned Magistrate Judge for appropriate action under 28 U.S.C. § 636(a)-(b), Federal Rule of Civil Procedure 72, and S.D. Ala. GenLR 72(a). *See* S.D. Ala. GenLR 72(b); (5/27/2020 electronic reference). In accordance with the Court's briefing schedule (*see* Docs. 26, 28), the Relator, Stephanie Strong Blankenship, has timely filed a response (Doc. 30) in opposition to the motion, and Lincare has timely filed a reply (Doc. 32) to the response. Lincare's motion is now under submission and ripe for disposition. Upon due consideration, and for the reasons explained herein, the undersigned will recommend that Lincare's motion be **GRANTED in part and DENIED in part**.

## I.    *Procedural Background*

On March 6, 2019, Blankenship, a former Lincare employee, filed a three-count sealed complaint against Lincare and Lincare Holdings, Inc., alleging causes of action under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA" or "the

Act"). Counts I and II alleged *qui tam* causes of action violations of 31 U.S.C. § 3729(a)(1)(A) and (B), respectively,[1] while Count III alleged a violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h). After the United States gave notice on December 2, 2019, that it did not intend to intervene in this action (Doc. 7), the Court ordered the complaint unsealed and directed Blankenship to serve the defendants. (*See* Doc. 8).[2]

On April 27, 2020, the defendants filed a joint Rule 12(b)(6) motion to dismiss the initial complaint (Doc. 21). Rather than litigate that motion, on May 13, 2020, Blankenship amended her complaint as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B). (*See* Doc. 23). The amended complaint dropped all claims against Lincare Holdings, Inc. but continued to assert the same three causes of action against Lincare. (*See id.*). In light of the amended complaint, the Court mooted the

---

[1] "The Act may be enforced through civil actions initiated by the government or suits by private individuals on behalf of the United States, called qui tam actions. The private plaintiffs in qui tam actions are known as 'relators,' and the Act entitles them to a percentage of any recovery made on behalf of the government from a False Claims Act defendant." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1321–22 (11th Cir. 2009). *See also* 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government."). A relator's complaint must "be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." 31 U.S.C. § 3730(b)(2).

[2] "The Government may elect to intervene and proceed with the [qui tam] action within 60 days after it receives both the complaint and the material evidence and information … Before the expiration of the 60-day period or any extensions obtained under [§ 3730(b)(3)], the Government shall-- (A) proceed with the action, in which case the action shall be conducted by the Government; or (B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action." 31 U.S.C. § 3730(b)(2) & (4).

Defendants' motion to dismiss the initial complaint. (*See* Doc. 24).[3] Lincare filed the present motion to dismiss the amended complaint (Doc. 25) on May 27, 2020.

## II. *Legal Standards*

In deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a court must "accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Duty Free Ams., Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1262 (11th Cir. 2015). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' … [T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (citations and some quotations omitted). *See also Duty Free Ams.*, 797 F.3d at 1262 (Courts " 'afford no presumption of truth to legal conclusions and recitations of the basic elements of a cause of action.' " (quoting *Franklin v. Curry*, 738 F.3d 1246, 1248 n. 1 (11th Cir. 2013) (per curiam))).

---

[3] "As a general matter, '[a]n amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary.' " *Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007) (per curiam) (quoting *Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V OLYMPIA VOYAGER*, 463 F.3d 1210, 1215 (11th Cir. 2006) (citation and quotation omitted)); *Fritz v. Standard Sec. Life Ins. Co. of N.Y.*, 676 F.2d 1356, 1358 (11th Cir. 1982) ("Under the Federal Rules, an amended complaint supersedes the original complaint.").

"To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). In other words, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

*Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and quotation marks omitted). Put another way, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[T]o determine what the plaintiff must plausibly allege at the outset of a lawsuit, [courts] usually ask what the plaintiff must prove in the trial at its end." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014, 206 L. Ed. 2d 356 (2020)

Moreover, " 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.' " *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S at 678). *Iqbal* "suggested that courts considering motions to dismiss adopt a 'two-pronged

approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.' " *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Importantly, … courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting *Iqbal*, 556 U.S. at 679 (quoting *Twombly,* 550 U.S. at 567)).

### III.   *Well-Pleaded Allegations*

Blankenship was employed for approximately six years at Healthcare Solutions in Selma, Alabama. (Doc. 23, PageID.106, ¶ 12). She started in July 2010 as a respiratory therapist, and was promoted to Center Manager in February 2011. (*Id.*, ¶ 17). As Center Manager, Blankenship's duties included overseeing the operation of all areas of the center such as sales; customer service; clinical and delivery, including growing the patient base, purchasing equipment and supplies; and ensuring that operational procedures complied with federal, state, and local regulations. (*Id.*, PageID.106-107, ¶ 17). In September or October of 2015, the Selma Healthcare Solutions center combined with Lincare's Selma operation and continued operating as Lincare. (*Id.*, ¶¶ 12, 18). Blankenship continued working at the Selma Lincare center as a respiratory therapist until she was terminated on March 7, 2016. (*Id.*). As a Lincare respiratory therapist, her duties included equipment setups for ventilators, monitors, CPAP units, and other respiratory  services in patients'

homes; providing patient education; and performing care checks on current patients. (*Id.*, PageID.107, ¶ 18).

### a.    Suspicious Practices

While performing her duties as a Respiratory Therapist for Lincare, Blankenship discovered, both from personal observation and interaction with patients and doctors, that Lincare engaged in the following conduct, which Blankenship alleges violated the FCA: billing for oxygen equipment after receiving notice that the customer was no longer using the equipment; billing for portable oxygen tanks when the customer did not require them; fabricating evidence to support claims that customers had ordered refills of oxygen that they never requested; testing potential customers and providing oxygen to Medicare beneficiaries without physician orders; and failing to return overpayments received from government payors. (*Id.*, ¶ 19). Moreover, in September 2015, Blankenship noticed that the signatures on Certificates of Medical Necessity ("CMN") from prescribing physicians Dr. Bruce Taylor, Dr. Walid Freij, and Dr. Samer Fahoum looked unusual. (*Id.*, ¶ 20). Blankenship was very familiar with the signatures of these physicians because they frequently referred patients to Lincare, and concluded that the signatures had been forged by someone in Lincare's office. (*Id.*, ¶¶ 20-21).

In late September or early October 2015, Blankenship anonymously called the Lincare corporate hotline and reported the above suspicious activity. (*Id.*, PageID.108, ¶ 22). In October 2015, Blankenship called and reported the activity to Vanessa Hager, a Lincare billing supervisor and compliance investigator at Lincare's

corporate office. (*Id.*, PageID.108, 114, ¶¶ 23, 52). On November 12, 2015, Blankenship had a follow-up telephone conversation with Hager to check on the status of her investigation, and reported that patient "JB" had complained to her about being billed for equipment that JB never received. (*Id.*, PageID.108, 115, ¶¶ 23, 56). Blankenship believes that Lincare failed to conduct even a facially sufficient investigation into her allegations, as, to her knowledge, Lincare never contacted any of the physicians who Blankenship identified as having had their signatures forged on CMNs to verify their authenticity, or JB to verify Blankenship's allegation that JB was being billed for equipment never received. (*Id.*, PageID.108, ¶ 24).

Blankenship also discussed the above-mentioned issues with Lincare District Manager Ashley Holler on November 13, 2015. (*Id.*, ¶ 25). Blankenship informed Holler about being scheduled to perform care checks and equipment delivery for patients that did not have a Plan of Treatment. (*Id.*). Blankenship also told Holler that Center Manager Donja Smith impeded her ability to perform vent checks and limited her access to Lincare's computer system, that she was being singled out and constantly called into Smith's office, and that she was afraid to ask if she could go to the hospital for a migraine for fear of getting written up by Smith. (*Id.*). Holler said she would come to the Selma Center the following week to meet with Smith and Blankenship. (*Id.*). Blankenship asked for a written job description and expectations to ensure that she was meeting Lincare's standards. (*Id.*).

Between February and December of 2015, Smith ordered Trilogy ventilators for six patients. (*See id.*, PageID.108-110, ¶¶ 26-31). Blankenship alleges the following facts concerning each ventilator:

| Patient | Account # | Month Ordered |
|---------|-----------|---------------|
| EH | 042-120-001 265 | February 2015 |
| DT | 002-630-929 | March 2015 |
| OB | 002-253-417 | June 2015 |
| SK | 003-109-547 | July 2015 |
| CB | 002-615-332 | September 2015 |
| LH | 002-585-755 | December 2015 |

(*See id.*).

Blankenship alleges that Medicare was billed for each ventilator. (*See id.*). For each ventilator except LH's, she alleges that Lincare was reimbursed from the month Smith ordered the ventilator "until at least 2016." (*Id.*). For LH's ventilator, Blankenship alleges that "Medicare approved a reimbursement of $1,561.00 per month" but provides no date range for this reimbursement. (*See id.*, PageID.109, ¶ 27). Each ventilator was located at the Selma Center on January 19, 2016, and Blankenship obtained signed statements from five of the six patients between January and March of 2016 attesting that none of them had ever had a Trilogy machine. (*See id.*). She also alleges that, "through her work at Lincare," she is otherwise aware that none of the patients for whom the ventilators were ordered ever received one. (*See id.*, PageID.108-110, ¶¶ 26-31). At the time Medicare was billed for each of the machines, Smith was the only person in the Selma Center qualified to set up the machines in patients' homes. (*Id.*, PageID.110, ¶ 32). Blankenship claims that

the United States has paid, "at a minimum, $61,035.00" to Lincare for false claims. (*Id.*, PageID.111, ¶ 39).

### b.     Retaliatory Conduct

On or about October 21, 2015 (after she had made her call to Lincare's anonymous hotline, and spoken with Hager for the first time), Blankenship was called into Smith's office and received a written warning that she was "not demonstrating the dedication and commitment level expected of an employee of Lincare." (*Id.*, PageID.114, ¶ 53). The written warning also stated: "On average you are to make 6-8 clinical visits per day and 20 Care Checks per month, including overnight oximetries. You need to follow-up immediately with all overnight oximetries/Care Check results and turn in the reports and paperwork daily. All Delivery Tickets for new set-ups, supplies or visits need to be given to the Customer Service Representative within 24 hours." (*Id.*, PageID.114-115, ¶ 54). Blankenship requested a list of the duties expected of a Healthcare Specialist. (*Id.*, PageID.115, ¶ 55).

In response to Blankenship's phone calls reporting suspected fraudulent activity, Hager came to the Selma Lincare facility between November and December 2015 to interview employees, including Blankenship. (*Id.*, ¶ 58). Hager asked Blankenship if she had knowledge of any wrongdoing and asked for specific examples. (*Id.*, ¶ 59). Blankenship told Hager that she had already reported specific instances of wrongdoing, but nevertheless went back over the details with Hager. (*Id.*, ¶ 59).

On November 18, 2015, Blankenship was given a document titled "Healthcare Specialists Expectations" and asked to sign it, as were Smith and Holler. (*Id.*, ¶ 60). The document outlined the duties Blankenship was expected to perform, including "5 complete care checks per week/20 per month." (*Id.*, ¶ 61). On or about December 1, 2015, Blankenship was called into Smith's office and was told that she was being placed on probation, for a period extending up to 60 days from that date, because her performance was not meeting acceptable standards and she had serious performance deficiencies. (*Id.*, PageID.115-116, ¶¶ 62-64). Blankenship was provided with an Action Plan "to outline the specific actions required by [her] to bring her performance to an acceptable, competent level, meeting the full requirements of the Healthcare Specialist position." (*Id.*, PageID.116, ¶ 65). The Action Plan required improvement in the specific areas of productivity, attendance, and patient complaints, and also required Blankenship to make, on average, 6 to 8 clinical visits per day, and 20 care checks per month. (*Id.*). Blankenship disputes that her work performance was deficient, asserting that she consistently performed the tasks assigned to her but could not perform the number of ventilator checks to meet Lincare's standards because Smith preferred to do them herself. (*Id.*, ¶ 66). Smith also limited Blankenship's access to Lincare's computer system to where she could not download the necessary information to perform care checks without going through Smith. (*Id.*). Smith was fired from Lincare in late December 2015 or early January 2016. (*Id.*, ¶ 67).

On or about February 3, 2016, Holler met with Blankenship and accused her of having a second job at Jackson Hospital. (*Id.*, ¶ 68). After the meeting, Blankenship emailed Holler a statement verifying that she had not worked at Jackson Hospital since either July or August of 2010, and that she had not worked a second job since she had been employed with HealthCare Solutions/Lincare. (*Id.*, ¶ 69). On or about March 7, 2016, Holler called Blankenship while she was out of the office doing care checks and requested that Blankenship meet with her when she returned. (*Id.*, ¶ 70). When Blankenship met with Holler, Holler gave her a termination letter dated March 7, 2016, and informed her that she was terminated effective immediately. (*Id.*, ¶ 71). The termination letter stated that for the month of February 2016, Blankenship had performed only one care check and had not been doing ventilator checks. (*Id.*, ¶¶ 72).

Disputing that statement, Blankenship alleges that she conducted 8 care checks, 32 overnight oximetry pickups, and 6 ventilator checks during February 2016. (*Id.*, PageID.116-117, ¶¶ 72-73). Holler was aware of this because of the Healthcare Specialist Daily Log kept by Blankenship and submitted to Holler, and because of text message conversations between the two regarding care checks and patients seen that month. (*Id.*, PageID.117, ¶¶ 74-76). For example, on February 5, 2016, Holler sent Blankenship a message asking her how many patients she had seen the day before. (*Id.*, ¶ 80). Blankenship responded that she had seen seven patients, giving reasons for the visits and her mileage, and reported leaving work at 6:34 p.m. (*Id.*). Blankenship never received any complaints or disciplinary actions

while serving as a Center Manager or Healthcare Specialist prior to her call to Lincare's corporate office reporting suspicious activity. (*Id.*, ¶ 77). Both Smith and Holler knew Blankenship had reported the activity to the corporate office, and Holler began monitoring Blankenship's activity by calling, emailing, and texting her during the workday after Blankenship's report to the corporate office. (*Id.*, ¶ 79).

## IV.    *Analysis*

### a.    **Rule 9(b)**

Counts I and II of the amended complaint allege FCA causes of action for violations of 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), respectively. Section 3729(a)(1)(A) subjects to civil liability any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[,]" while § 3729(a)(1)(B) does so for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim…"[4] Lincare argues that Counts I and II are due to be dismissed because Blankenship fails to allege certain essential details of those claims with the particularity required by Federal Rule of Civil Procedure 9(b).

The Eleventh Circuit has held that,

---

[4] "On May 20, 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009 ('FERA'), Pub. L. No. 111–21, 123 Stat. 1617 (2009), which amended the FCA and re-designated 31 U.S.C. § 3729(a)(1) as 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(2) as 31 U.S.C. § 3729(a)(1)(B)." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). FERA also "amended 31 U.S.C. § 3729(a)(2) (2003), replacing the words 'to get a false or fraudulent claim paid or approved by the government' with the words 'material to a false or fraudulent claim.' " *Hopper*, 588 F.3d at 1327 n.3.

[i]n addition to the requirements of *Twombly, Iqbal,* and Federal Rules of Civil Procedure 8(a) and 12(b)(6), claims asserted under the False Claims Act (as well as other fraud claims) are subject to the pleading standards of Federal Rule of Civil Procedure 9(b). *See United States ex. rel. Clausen v. Laboratory Corp. of Am., Inc.,* 290 F.3d 1301, 1309–10 (11th Cir. 2002). That rule provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other condition of mind of a person shall be averred generally." FED. R. CIV. P. 9(b). Rule 9(b) is satisfied if the plaintiff pleads "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997)).

In the context of the False Claims Act, the complaint must set forth "facts as to time, place, and substance of the defendant's alleged fraud" and "the details of the [defendant's] allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen,* 290 F.3d at 1309–10 (quotation omitted); *accord United States ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1302 (11th Cir. 2010). "Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)." *United States ex. rel. Karvelas v. Melrose–Wakefield Hosp.,* 360 F.3d 220, 232 (1st Cir. 2004) … [T]he Eleventh Circuit has recognized that while these requirements of Rule 9(b) may, in practice, make it difficult for a *qui tam* plaintiff to bring an action, they are necessary to prevent "[s]peculative suits against innocent actors for fraud" and charges of guilt by association. *Clausen,* 290 F.3d at 1308 (quoting *United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla.,* 19 F.3d 562, 566–67 (11th Cir. 1994) (per curiam)).

*U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 793 (11th Cir. 2014) (per curiam) (unpublished) (footnote omitted). "Failure to satisfy Rule 9(b) is a ground for dismissal of a complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

### 1.    Count I

Lincare argues that Count I is not supported by sufficiently specific indicia of reliability indicating knowledge that a false claim was actually submitted to the government.[5] Except as to one specific scheme, the undersigned agrees.

"The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1311. " 'The submission of a [false] claim is ... the *sine qua non* of a False Claims Act violation.' " *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (quoting *Clausen,* 290 F.3d at 1311). "Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." *Clausen*, 290 F.3d at 1311. *See also id.* at 1312 n.21 ("[T]he 'true essence of the fraud' of a False Claims Act action involves an actual claim for payment and not just a preparatory scheme.");

---

[5] "To establish a cause of action under § 3729(a)(1)(A), a relator must prove three elements: (1) a false or fraudulent claim, (2) which was presented, or caused to be presented, for payment or approval, (3) with the knowledge that the claim was false." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017).

*Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009) ("Improper practices standing alone are insufficient to state a claim under either § 3729(a)(1)[A] or (a)[(1)(B)] absent allegations that a specific fraudulent claim was in fact submitted to the government."); *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) ("The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." (quoting *United States v. Lab. Corp. of Am.*, No. Civ.A.1:97CV2200TWT, 2001 WL 1867721, at *1 (N.D. Ga. May 16, 2001)). "As such, Rule 9(b)'s directive that 'the circumstances constituting fraud or mistake shall be stated with particularity' does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. "Nor may he point to 'improper practices of the defendant[ ]' to support 'the inference that fraudulent claims were submitted' because 'submission ... [can]not [be] inferred from the circumstances.' " *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005) (per curiam)). Rather, "if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *Clausen*, 290 F.3d at 1311.

"Indeed, even if the relator is an insider who alleges awareness of general billing practices, an accusation of '[u]nderlying improper practices alone [is]

insufficient ... absent allegations that a *specific fraudulent claim was in fact submitted* to the government.' " *Carrel*, 898 F.3d at 1275 (quoting, with added emphasis, *Corsello*, 428 F.3d at 1014). "Speculation that false claims 'must have been submitted' is insufficient." *Id.* (quoting *Corsello*, 428 F.3d at 1014). "In short, he must 'allege the "who," "what," "where," "when," and "how" of fraudulent submissions.' " *Id.* (quoting *Corsello*, 428 F.3d at 1014). "Although [a court] construe[s] all facts in favor of the plaintiff when reviewing a motion to dismiss, [the court cannot] make inferences about the submission of fraudulent claims because such an assumption would 'strip[ ] all meaning from Rule 9(b)'s requirements of specificity.' " *Corsello*, 428 F.3d at 1013 (quoting *Clausen*, 290 F.3d at 1312 n.21). Courts are to "evaluate whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis." *Atkins*, 470 F.3d at 1358.

*Carrel* provided the following overview of Eleventh Circuit Court of Appeals precedent concerning pleading sufficient "indicia of reliability:"

> For example, in *Clausen* we held that the relator's "descri[ptions of] the various schemes [the defendant company] allegedly implemented to generate unneeded or duplicative medical tests on unsuspecting ... patients" were insufficient because he "merely offer[ed] conclusory statements ... and d[id] not adequately allege when—or even if—the schemes were brought to fruition" by the actual submission of false claims. 290 F.3d at 1312. Although the relator generally alleged that false bills were submitted for unnecessary tests, "[n]o amounts of charges were identified," "[n]o actual dates were alleged," "[almost no] policies about billing or even second-hand information about billing practices were described," and "[n]o copy of a single bill or payment was provided." *Id.* And in *United States ex rel. Atkins v. McInteer*, we held that "detail[ed]" allegations of "an elaborate scheme for defrauding the government by submitting false claims" were insufficient when the

relator failed to "show[ ] that the defendants *actually submitted* reimbursement claims for the services he describe[d]." 470 F.3d 1350, 1359 (11th Cir. 2006). Although the relator was an insider "psychiatrist responsible for the provision of medical care,"[6] we explained that he lacked "firsthand knowledge of the defendants' submission of false claims" because he was "not a billing and coding administrator responsible for filing and submitting the ... claims" and relied instead on "rumors from staff and observ[ations of] records of what he believed to be the shoddy medical and business practices of two other psychiatrists." *Id.*; *see also* [*United States ex rel.*] *Sanchez* [*v. Lymphatx, Inc.*,] 596 F.3d [1300,] 1302 [(11th Cir. 2010)].

To be sure, "we are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012). For example, in *Matheny* we held sufficient allegations that the defendant had submitted false "[d]iscovery [s]amples" when the relator "allege[d] personal involvement in ... the creation of [an] actual [d]iscovery [s]ample," alleged when the discovery sample was submitted, *id.* at 1230, and "allege[d] in detail who made the [d]iscovery [s]amples ..., who approved and directed the process ..., and how various employees, including [the] [r]elator ..., altered the patient accounts to produce a false [d]iscovery [s]ample," *id.* at 1229. And in *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, we held sufficient allegations of fraudulent billing when the realtor was a nurse practitioner who had personally used incorrect billing codes on a consistent basis and had been told by the "office administrator" that the defendant healthcare provider " '*never*' billed [these fraudulent services] in another manner." 433 F.3d 1349, 1360 (11th Cir. 2005) (emphasis added). Although the relator failed to specify when the defendant actually submitted the false claims that were based on the fraudulent billing methods, we held that her pertinent insider information was "sufficient to explain why [she] believed [that the defendant] submitted false or fraudulent claims." *Id.* at 1360. Nonetheless, we have made clear that even if a relator "assert[s] ...

---

[6] On the other hand, the *Clausen* relator was a "corporate outsider" who was a competitor of, and had never worked for, the defendant. *See Clausen*, 290 F.3d at 1302-03, 1314.

direct knowledge of [a] defendant['s] billing and patient records," she still must allege "specific details" about false claims to establish "the indicia of reliability necessary under Rule 9(b)." *Sanchez*, 596 F.3d at 1302 (internal quotation marks omitted).

*Carrel*, 898 F.3d at 1275–76.

In *Corsello*, the Eleventh Circuit also found one of its prior unpublished cases instructive, noting:

> In *Hill v. Morehouse Medical Associates,* an unpublished opinion, we elaborated on the "indicia of reliability" required by *Clausen.* 82 F. App'x 213 (11th Cir. 2003) (per curiam). Hill, who was a former employee in the billing department of the defendant, alleged a billing process and details about five fraudulent billing schemes the defendant used to submit claims to the government. *Id.* Unlike the relator in *Clausen,* who was a "corporate outsider," Hill had "firsthand information" about the billing practices of the defendant. *Id.*[] Because Hill "worked in the very department where she alleged the fraudulent billing schemes occurred," her allegations that fraudulent claims were submitted on a daily basis were factually credible. This Court held that Hill's complaint satisfied Rule 9(b) because Hill was "privy to ... the internal billing practices" of the defendant and thus provided factual support for the allegations of fraudulent billing in her complaint. *Id.*[]

428 F.3d at 1013.[7]

Relator Corsello, a former sales employee for the defendant company – who was "neither a 'corporate outsider' nor an employee in the billing department" – argued that he was "unlike the relator in *Clausen* because, as a sales employee, he was 'aware' of the manner by which the defendants submitted fraudulent claims and had 'learned from his colleagues the national reach of the schemes.' " 428 F.3d at 1013. Corsello also argued that his operative complaint satisfied Rule 9(b) because it

---

[7] *Atkins* also found *Hill* instructive. *See Atkins*, 470 F.3d at 1358-59.

"alleged many details of numerous schemes, employees, and claims[, as well as] provided the initials of patients whose Medicare forms were improperly completed and eventually, Corsello alleged, 'resulted in the submission of fraudulent claims.' " *Id.* However, the Eleventh Circuit held that Corsello's complaint "failed to satisfy 9(b)[,]" finding that it

> failed to allege when, where, and what violations of the False Claims Act occurred. The complaint instead used vague allegations that improper practices took place "everywhere Lincare does business throughout the statutory time period." The allegations also failed to provide a factual basis to conclude fraudulent claims were ever actually submitted to the government in violation of the False Claims Act. At best, Corsello alleged that improper practices have "resulted in the submission of fraudulent claims," or "lead directly to the submission of fraudulent claims."
>
> Although Corsello worked in sales, his allegations, often based "on information and belief," lacked the "indicia of reliability" required by *Clausen* because they failed to provide an underlying basis for Corsello's assertions. Corsello did not explain why he believes fraudulent claims were ultimately submitted. Corsello's contention that he was "aware" of billing practices was neither particular to any specific fraudulent claim against the government nor factually supported because Corsello conceded that he "did not have access to company files outside his own offices." Underlying improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government. *Clausen,* 290 F.3d at 1311. In short, Corsello provided the "who," "what," "where," "when," and "how" of improper practices, but he failed to allege the "who," "what," "where," "when," and "how" of fraudulent submissions to the government.

*Id.* at 1013–14.

Lincare argues that the amended complaint alleges three categories of fraudulent schemes: (1) fraudulent practices relating to oxygen equipment and

services; (2) forged signatures on Certificates of Medical Necessity; and (3) fraudulent billing for ventilators that were not given to patients. (*See* Doc. 25-1, PageID.136-137). In response, Blankenship does not contest this assessment, but relies only on the third scheme, arguing:

> In her Amended Complaint, Relator alleged six specific examples of fraudulent claims that were submitted and for which Lincare received reimbursement from Medicare. See Amended Complaint at ¶¶ 26-31. In each of these examples, Relator alleged a similar set of facts: (1) a Trilogy Ventilator was ordered by the Lincare center manager, Donja Smith, for a patient (identified by initials *and* account number) who neither needed it nor received it; (2) the Trilogy Ventilator was later found at the Lincare facility in Selma, Alabama where Donja Smith had her office; (3) the specific months were identified during which Lincare billed Medicare for these machines; and (4) the specific months were identified for which Medicare reimbursed Lincare for these machines, in some cases for nearly a year, at a rate of $1,561.00 per month per machine. *See id.* Relator further averred that these factual allegations were based upon "her personal observation and from her interaction with patients and doctors," which occurred "[w]hile performing her duties as a Respiratory Therapist for Lincare." *Id.* at ¶ 19.

(Doc. 30, PageID.164-165).[8] Upon consideration, the undersigned agrees that Blankenship has pleaded sufficient indicia of reliability supporting submission of claims to the government for the Trilogy ventilators.[9]

---

[8] Contrary to her brief's assertion, the amended complaint does not allege "the specific months … for which Medicare reimbursed Lincare" for patient LH's ventilator (*see* Doc. 23, PageID.109, ¶ 27), or that any of the patients did not actually need the ventilators. (*See id.*, PageID.108-110, ¶¶ 26-31).

[9] Lincare does not argue that Blankenship fails to sufficiently allege a fraudulent scheme related to the ventilators, only that she has failed to sufficiently allege the actual submission of a claim to the government resulting from this scheme.

As was previously noted, *see Carrell*, *supra*, in affirming the dismissal of the relator's FCA claims for failure to sufficiently allege the actual submission of a false claim, the *Clausen* panel majority noted that "[n]o amounts of charges were identified[; n]o actual dates were alleged[; n]o policies about billing or even second-hand information about billing practices were described, other than to state that electronic [forms] with medical test codes were used[; and n]o copy of a single bill or payment was provided." *Clausen*, 290 F.3d at 1312. In a footnote, the majority clarified that the foregoing were just "some of the types of information that might have helped [the relator] state an essential element of his claim with particularity[,] and that it was "not mandat[ing] all of this information for any of the alleged claims." *Id.* n.21. Instead, only "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *Id. Accord Atkins*, 470 F.3d at 1358.

Here, Blankenship has alleged that Trilogy ventilators were ordered for six specific patients, each identified by his or her initials and Lincare account number. She has also alleged the month in which each machine was ordered, and who at Lincare ordered them (in all cases, Smith). For five of the six ventilators, she has alleged a time range during which Medicare reimbursed Lincare for the machine; for the sixth, she alleges that Medicare reimbursed at a rate of $1,561.00 per month, though without providing a date range. This provides "at least some of th[e] information" identified in *Clausen* supporting her allegations that false claims for the Trilogy ventilators were submitted. While Lincare correctly notes that Blankenship never expressly alleges that it submitted claims for these ventilators to the

government, her allegations that Medicare provided reimbursement for the ventilators necessarily indicate that claims for them were first submitted to Medicare. None of the foregoing authority indicates that Rule 9(b)'s specificity requirement must be so strictly construed as to forbid this reasonable inference, or that there are any sort of "magic words" a relator must allege to show submission of a claim.

Lincare also correctly notes that Blankenship does not profess to have been directly involved in billing for the Trilogy ventilators, or even to have any particularized knowledge of Lincare billing practices in general. Blankenship does not argue otherwise. However, as indicated by the case law discussed above, the Eleventh Circuit has found such considerations dispositive only in cases where the relator had otherwise left "out some particularities of the submissions of a false claim…" *Matheny*, 671 F.3d at 1230.[10] Here, Blankenship has alleged six specific

---

[10] *Compare id.* ("We recognized that Relator Matheny's personal involvement does not relate to the actual submission of the Discovery Sample [to the to the Office of Inspector General/Independent Review Organization], but we conclude Matheny's detailed allegations of the accounting records, his position at the company, and his involvement with the patient accounts provide sufficient support to Relator Matheny's allegation that he was working on the records used to populate the Discovery Sample and the Discovery Sample itself, and not merely an internal sample."); *Walker*, 433 F.3d at 1360 (although relator failed to specify when the defendant actually submitted false claims, relator's pertinent insider information was "sufficient to explain why [she] believed [that the defendant] submitted false or fraudulent claims"); *and Hill v. Morehouse Med. Assocs., Inc.*, No. 02-14429, 2003 WL 22019936, at *4-5 (11th Cir. Aug. 15, 2003) (per curiam) (unpublished) (fact that relator worked in defendant's billing department where the fraudulent schemes occurred sufficiently bolstered her more general allegations that fraudulent claims were submitted on a daily basis); *with Corsello*, 428 F.3d at 1013-14 ("insider" relator's failure to identify the submission of a specific fraudulent claim not excused where relator only alleged he was "aware" of fraudulent billing practices and based

claims for Trilogy ventilators which resulted in payment from the government to Lincare, and she has provided at least "some of the information" that *Clausen* deemed helpful to support those claims. Accordingly, her lack of direct participation in, or specialized knowledge of, Lincare's billing practices is not fatal to her FCA claims based on the Trilogy ventilators. However, the undersigned agrees with Lincare that Blankenship fails to allege with requisite specificity that any of the other schemes detailed in her amended complaint resulted in the actual submission of a false claim to the government. Blankenship does not argue otherwise in her response.

While the undersigned recognizes that *Clausen* only requires sufficient information "for at least some of [a relator's FCA] claims" to satisfy Rule 9(b), *Clausen*, 290 F.3d at 1312 n.21, the undersigned cannot ignore the Eleventh Circuit's recognition that the "particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Atkins*, 470 F.3d at 1359 (quotations omitted). As the Eleventh Circuit has explained, when "a plaintiff does not specifically plead the minimum elements of his allegation,

---

many of his allegations "on information and belief"); *and Atkins*, 470 F.3d at 1350 ("insider" relator's failure to identify the submission of a specific fraudulent claim not excused where relator was "not a billing and coding administrator responsible for filing and submitting" claims, did "not profess to have firsthand knowledge of the defendants' submission of false claims[,]" and based his allegations largely on "rumors from staff" and "observ[ation of records] of what he believed to be …. shoddy medical and business practices" by other employees). *See also Carrel*, 898 F.3d at 1276 ("[E]ven if a relator asserts direct knowledge of a defendant's billing and patient records, she *still must* allege specific details about false claims to establish the indicia of reliability necessary under Rule 9(b)." (emphasis added) (quotations omitted)).

it enables him to learn the complaint's bare essentials through discovery and may needlessly harm a defendant's goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and at worst, baseless allegations used to extract settlements." *Id.* (quotation omitted). "The particularity requirement of Rule 9(b), if enforced, will not only protect defendants against strike suits, but will result in claims with discernable boundaries and manageable discovery limits." *Id.* at 1360 (quotation omitted). Because Blankenship has only pleaded the actual submission of false claims from one discrete scheme – Smith's ordering of Trilogy ventilators – and has not attempted to rely on any of the other schemes in opposition to Lincare's present motion, the undersigned finds that Lincare's motion to dismiss is due to be **GRANTED** as to Count I for failure to satisfy Rule 9(b), *except* as it relates to the Trilogy ventilator scheme.[11]

## 2.    Count II

"To prove a claim under § 3729(a)(1)(B), a relator must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017). Lincare argues that Count II is due to be dismissed because Blankenship fails to allege any "false statement" with the particularity required by Rule 9(b). Blankenship does not address this argument in her response, and the undersigned agrees.

---

[11] Nevertheless, as will be discussed later, the undersigned also finds that Count I is due to be dismissed in its entirety for failure to adequately plead the FCA's scienter requirement.

As noted previously, "when fraud is alleged[,] Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Clausen*, 290 F.3d at 1310 (quotation omitted). The amended complaint does not come close to this level of particularity with regard to any purportedly false statement in support of Count II.

Blankenship conclusorily alleges that, "[i]n those cases in which Lincare improperly initiated orders for respiratory equipment and services related to such equipment that was not prescribed by medical providers, Lincare caused patients to make false statements to the United States by having these patients sign false documents related to such services and equipment." (Doc. 23, PageID.112-113, ¶ 43). However, Blankenship fails to provide any details regarding a single specific false statement purportedly made by a Lincare patient. Blankenship also alleges that "Lincare made a false record or statement to the United States by forging the signatures of medical providers upon the Certificates of Medical Necessity." (*Id.*, PageID.113, ¶ 44). However, Blankenship never explains what a Certificate of Medical Necessity is, what the Certificates were for, or who at Lincare allegedly forged the signatures. Indeed, Blankenship's sole justification for concluding that the signatures were forged is that they appeared "unusual" from the physicians'

signatures that she was used to seeing. Blankenship fails to allege sufficient detail to support her conclusion that the signatures were forged at all, much "by someone in the Lincare office" as she claims. (Doc. 23, PageID.107, ¶ 21). Moreover, as Lincare correctly points out, Blankenship has failed to allege with requisite specify that any of the forged Certificates of Medical Necessity actually resulted the government paying a false claim. *See Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) ("And while § 3729(a)[(1)(B)] does not require the false claim's actual presentment to the government for payment, it also does not impose liability for false statements unless they actually cause the government to pay amounts it does not owe. So to prevail on a claim under this subsection, the relator must prove that the government actually paid a false claim. For this reason, to satisfy Rule 9(b)'s heightened-pleading requirements, the relator has to allege with particularity that the defendant's false statements ultimately led the government to pay amounts it did not owe." (citations and quotations omitted)). For these reasons, Lincare's motion to dismiss is due to be **GRANTED** as to Count II for failure to satisfy Rule 9(b).

### b.    Scienter

Lincare also argues that the amended complaint fails to allege sufficient facts satisfying the FCA's scienter requirement.

> The False Claims Act's scienter requirement is "actually quite nuanced." *United States v. King–Vassel,* 728 F.3d 707, 712 (7th Cir. 2013). For liability to attach, the relator must show that the defendant acted "knowingly," which the Act defines as either "actual knowledge," "deliberate ignorance," or "reckless disregard."[12] § 3729(b). Although

---

[12] " 'Congress added the "reckless disregard" provision to the FCA in 1986' in order 'to ensure that "knowingly" captured the "ostrich" type situation whether an individual

proof of a "specific intent to defraud" is not required, *id.,* the statute's language makes plain that liability does not attach to innocent mistakes or simple negligence, *King–Vassel,* 728 F.3d at 712.

*Id.* at 1058.

Rule 9(b) provides that, unlike "fraud or mistake," "knowledge[] and other conditions of a person's mind may be alleged generally." Recognizing that " 'generally' is a relative term, the United States Supreme Court has explained

> In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading [state of mind] under an elevated pleading standard. It does not give him license to evade the less rigid—though still operative—strictures of Rule 8. *See* 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p. 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) ... should control the second sentence of Rule 9(b)"). And Rule 8 does not empower [a plaintiff] to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

*Iqbal*, 556 U.S. at 686–87. Accordingly, Blankenship must still plausibly allege under Rule 8(a) that the FCA's scienter requirement is met. *See Urquilla-Diaz*, 780 F.3d at 1051 (11th Cir. 2015) ("In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that a party alleging fraud 'must state with particularity the

---

has "buried his head in the sand" and failed to make simple inquiries which would alert him that false claims are being submitted.' " *Phalp*, 857 F.3d at 1155 (quoting *Urquilla–Diaz*, 780 F.3d at 1058 (internal quotations partially omitted) (quoting S. REP. 99–345, at 21, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5288)).

circumstances constituting fraud' but may allege scienter generally." (citation omitted)).

In response to Lincare's scienter argument, Blankenship again relies only on the Trilogy ventilators scheme, claiming that Lincare was aware of the false claims for those machines through former Center Manager Donja Smith. In support, Blankenship points to her allegations that Smith "ordered" the six Trilogy ventilators for specific patients throughout 2015; that the machines were located at Lincare's Selma facility on January 19, 2016, rather than in the homes of the respective patients for whom they were ordered; that five of the six patients submitted statements to Blankenship attesting that they never received Trilogy ventilators; and that Smith "was the only person in the center qualified to setup the Trilogy machines in the patients' homes" (and therefore, it can reasonably be inferred, would have known that the Trilogy machines she had ordered were not actually being used by the patients). (*See* Doc. 23, PageID.108-110, ¶¶ 26-32).

At most, however, those allegations establish only that Smith knowingly ordered unnecessary equipment. The FCA, however, punishes fraud on the government, not on private entities, and the undersigned agrees with Lincare that Blankenship has failed to allege sufficient factual matter showing that Smith "knowingly present[ed] or cause[d] to be presented," or "knowingly ma[de], use[d], or cause[d] to be made or used," any claim to the government. 31 U.S.C. § 3729(a)(1)(A)-(B). Contrary to Blankenship's assertions in her response brief, though she alleges that Smith "ordered" each of the ventilators, and that at some point

Medicare was billed and provided reimbursement for them, nowhere in the amended complaint does she actually allege that it was Smith who "submitted the fraudulent claims to Medicare." (Doc. 30, PageID.167). While "proof of a 'specific intent to defraud' is not required" for purposes of proving scienter under the FCA, *Urquilla-Diaz*, 780 F.3d at 1058 (quoting 31 U.S.C. § 3729(b)), Lincare correctly points out that Blankenship "never alleges that Ms. Smith was involved with or aware of any *billing* or any *submission of claims*" at all. (Doc. 25-1, PageID.143).[13] Moreover, the amended complaint is devoid of any specifics regarding Lincare's billing practices, and Blankenship has failed to allege how Smith's ventilator orders came to be submitted to Medicare for reimbursement.

As such, Blankenship has not alleged "more than a sheer possibility" that Smith, or any other Lincare employee, actually knew, or acted with deliberate ignorance or reckless disregard for the possibility that, fraudulent claims for the ventilators would be submitted to Medicare, which is insufficient to plausibly allege scienter under Rule 8(a). *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quotation marks omitted).

---

[13] While Blankenship never alleges what Smith's duties were as Center Manager, Blankenship's description of her own duties when she held that position did not include billing, submission of claims to the government, or the like (*see* Doc. 23, PageID.106-107, ¶ 17), and Blankenship has not attempted to claim otherwise in her response brief.

Blankenship has not pointed to any other allegations to support scienter, and none are apparent to the undersigned. Accordingly, Lincare's motion to dismiss is due to be **GRANTED** as to Counts I and II for failure to plausibly plead scienter under Rule 8(a).[14]

### c.    Retaliation

Count III alleges a cause of action under the FCA's anti-retaliation provision, which states that "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under th[e FCA] or other efforts to stop 1 or more violations of th[e FCA]." 31 U.S.C. § 3730(h)(1). A "but-for causation standard applies to claims under the antiretaliation provision of the False Claims Act[,]" meaning that a plaintiff must " 'show that the harm would not have occurred in the absence of[,] that is, but for' his protected conduct." *Nesbitt v. Candler Cty.*, 945 F.3d 1355, 1358-59

---

[14] The Supreme Court, in dicta, has described the FCA's scienter requirement as "rigorous." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002, 195 L. Ed. 2d 348 (2016). Lincare argues that this observation from *Universal Health* imposes a heightened pleading standard under Rule 8(a) for the scienter element of FCA claims, citing a single district court case in support. "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709, 131 S. Ct. 2020, 2033 n.7 (2011) (quotation omitted). However, because Blankenship has failed to sufficiently allege scienter even under Rule 8(a)'s normal plausibility pleading standard, the Court need not decide whether the FCA's scienter element is subject to a higher pleading standard as Lincare claims.

(11th Cir. 2020) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346-47, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013) (quotation marks and dash omitted)).

The amended complaint alleges that Blankenship was terminated "as a consequence of [her] efforts to prevent fraudulent billing" (Doc. 23, PageID.118, ¶ 86); in her response to the present motion, Blankenship has not attempted to argue that any other adverse action but her termination supports her Count III claims. Lincare argues that Blankenship has failed to plausibly plead that any activity protected under the FCA was the but-for cause of her termination "because, based on her own allegations, at least one intervening act of misconduct supported Lincare's decision to terminate her employment – her failure to meet the productivity standards in February 2016 despite recent and repeated warnings immediately prior to her March 2016 termination." (Doc. 25-1, PageID.147). As Lincare points out, Eleventh Circuit authority has held that "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (per curiam). *See also Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 521 (11th Cir. 2007) (per curiam) (unpublished) (plaintiff employee's "intervening act of misconduct, which was plainly in violation of … AirTran Airways Crew Member Handbook, severed the causal connection (if any) between [her] initial complaint of discrimination and AirTran's decision to terminate her employment").[15]

---

[15] Lincare primarily relies on the noted holdings from *Henderson* and *Hankins* in arguing for dismissal of Count III. (*See* Doc. 25-1, PageID.147-148). The *Henderson* and *Hankins* opinions are both unpublished; thus, they "are not considered binding

As Lincare sees it, Blankenship "acknowledges that in February 2016 – *after Ms. Smith was terminated and gone* – [Blankenship] only conducted '8 care checks' – 12 fewer than the objective monthly requirement of 20." (Doc. 25-1, PageID.146 (citing Amended Complaint, ¶¶ 73, 75 (emphasis Lincare's))). In response, Blankenship argues that Lincare "makes a crucial mistake in arguing that this was twelve fewer than she was required to make during that month. As … stated in the Complaint, she was required make 'on average . . . 6-8 clinical visits per day and 20 Care Checks per month, <u>including overnight oximetries</u>.' " (Doc. 30, PageID.168 (quoting Amended Complaint, ¶ 54 (emphasis Blankenship's))). As Blankenship

---

precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2. *See also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority."). One judge of this Court has found the relevant *Henderson* and *Hankins* holdings to be unpersuasive and rejected the argument "that intervening misconduct severs the prima facie showing of causal connection made by a sufficiently brief interval between protected activity and the adverse employment action." *Gross-Jones v. Mercy Med.*, 874 F. Supp. 2d 1319, 1343-45 (S.D. Ala. 2012) (Steele, J.), *reconsidered in part on other grounds*, No. CIV.A. 11-0132-WS-M, 2012 WL 2416651 (S.D. Ala. June 26, 2012). *See also Moore v. GPS Hosp. Partners IV, LLC*, 383 F. Supp. 3d 1293, 1315 & n.90 (S.D. Ala. 2019) (Steele, J.) (rejecting application of *Hankins* based on reasoning in *Gross-Jones*). However, the district judge presiding over this case has applied the relevant holding from *Hankins*, *see DeLeon v. ST Mobile Aerospace Eng'g, Inc.*, 684 F. Supp. 2d 1301, 1325 (S.D. Ala. 2010) (DuBose, J.), as has the Eleventh Circuit in another unpublished opinion, *see Rosa v. City of Fort Myers, FL*, 297 F. App'x 830, 834 (11th Cir. 2008) (per curiam) (unpublished), and other Eleventh Circuit district judges have applied the relevant *Henderson* holding. *See, e.g., Trainer v. Supreme Beverage Co.*, No. 2:11-CV-00057-WMA, 2013 WL 169288, at *6 (N.D. Ala. Jan. 10, 2013) (Acker, J.); *Anibal Antonio Aguilar Fernandez v. Winn-Dixie Stores, Inc.*, No. 17-CV-60322, 2018 WL 538699, at *7 (S.D. Fla. Jan. 24, 2018) (Bloom, J.); *Lee v. City of Walthourville*, No. 4:18-CV-90, 2020 WL 907862, at *10 (S.D. Ga. Feb. 24, 2020) (Baker, J.) (applying *Henderson* and *Hankins*). Moreover, Blankenship has not argued against the application of either *Henderson* or *Hankins* in response to the present motion. Therefore, the undersigned will apply their noted holdings in this case.

points out, the amended complaint alleges "that, for the month of February 2016, she 'conducted 8 care checks, 32 overnight oximetry pickups, and 6 ventilator checks…' …. Thus, during February 2016, [she] actually *doubled* her required productivity (8 care checks plus 32 overnight oximetries).' " (*Id.*, PageID.168-169 (quoting Amended Complaint, ¶ 73)). Accordingly, argues Blankenship, Lincare "has identified no intervening acts of misconduct on [her] part to justify her dismissal…" (*Id.*, PageID.169). Accepting her allegations as true, and construing them in the light most favorable to her, the undersigned agrees that the amended complaint does not show intervening misconduct as Lincare claims.

In reply, Lincare argues that Blankenship's argument erroneously relies on language from the October 2015 written warning, though it does not dispute Blankenship's reading that document as counting overnight oximetries towards the 20 care checks per month Blankenship was required to perform. (*See* Doc. 23, PageID.114, ¶ 54 ("Th[e October 21, 2015] written warning also stated that 'on average you are to make 6-8 clinical visits per day and 20 Care Checks per month, including overnight oximetries.")). Lincare asserts that the language of two later-received documents – the "Healthcare Specialists Expectations" given to Blankenship to sign on November 18, 2015, and the Action Plan given to her on December 1, 2015 – controlled her job description at the time of her termination. Lincare continues that neither of those documents "indicated that 'overnight oximetries' would suffice to satisfy the care check requirement[,]" but rather, "that overnight oximetries are included within, and not separate from, care checks." (Doc.

32, PageID.183). While Lincare does not point to relevant provisions from those documents in the amended complaint, Lincare attaches what it asserts are "true and correct" copies of those documents to its reply. (*See* Docs. 32-1, 32-2). Neither of those documents was attached to either the initial or amended complaint.

In considering "Rule 12(b)(6) dismissals, it is generally true that the scope of the review must be limited to the four corners of the complaint." *Speaker v. U.S. Dep't of Health & Human Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) (quotation omitted). "If matters outside the pleadings are presented by the parties and considered by the district court, the Rule 12(b)(6) motion must be converted into a Rule 56 summary judgment motion." *Id.* (citing Fed. R. Civ. P. 12(d)). However, the Eleventh Circuit "has recognized an important qualification to this rule where certain documents and their contents are undisputed: In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Id.* (quotation omitted).

However, it has also long been the rule in the Eleventh Circuit that "an appellant who does not raise an issue in his opening brief may not do so in his reply brief [or] a supplemental brief," *United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015) (en banc) (per curiam), and this Court regularly enforces a similar rule in motion practice. *See, e.g.*, *Mingo v. City of Mobile, Ala.*, No. CIV.A. 12-00056-KD-B, 2013 WL 6094674, at *10 n.6 (S.D. Ala. Nov. 20, 2013) (DuBose, J.), *aff'd*, 592 F. App'x 793 (11th Cir. 2014); *Nelson v. Whirlpool Corp.*, No. CIV.A. 09-0520-WS-B,

2011 WL 1832749, at *3 & n.7 (S.D. Ala. May 12, 2011) (Steele, J.); *Garcia v. Certain Underwriters at Lloyd's London*, No. CV 16-00635-CG-B, 2017 WL 2304005, at *2 (S.D. Ala. Apr. 13, 2017) (Bivins, M.J.), *report and recommendation adopted*, 2017 WL 2304004 (S.D. Ala. May 25, 2017) (Granade, J.). Here, Lincare waited until its reply brief to include and discuss the two extraneous exhibits, thus depriving Blankenship of her opportunity to address them. Lincare had no good reason not to include these documents with its opening brief – its argument for dismissal of Count III singularly hinges on whether Blankenship was actually performing the duties of her job, and the amended complaint put Lincare on adequate notice that it would need to rely on the actual wording of the November and December 2015 documents in order to advance that argument, as Blankenship also quoted and/or cited those documents to various degrees in her amended complaint in claiming that she had fact met her quota for February 2016. (*See* Doc. 23, PageID.114-117, ¶¶ 54, 60-61, 65, 72-73). Accordingly, the Court should decline to consider the extraneous exhibits Lincare has presented for the first time with its reply.

Alternatively, even if the Court were to consider the "Healthcare Specialists Expectations" and the Action Plan, neither of those documents clearly contradict the relevant job description included in the October 2015 written warning. The Action Plan merely states that Blankenship "[o]n an average [was] to make 6-8 clinical visits per day and 20 Care Checks per month[,]" without mentioning overnight oximetries at all. (Doc. 32-2, PageID.193). Thus, while the Action Plan does not state

that oximetries count as Care Checks, it also does not say they don't, and thus is not in obvious tension with the October 2015 written warning.

The "Healthcare Specialists Expectations" states that Blankenship was "required to perform 5 complete care checks per week/ 20 per month; this includes a cover letter, assessment, and overnight oximetry…" (Doc. 32-1, PageID.189). While this provision could reasonably be interpreted to mean, as Lincare asserts, "that overnight oximetries are included within, and not separate from, care checks," it is sufficiently ambiguous such that Blankenship's interpreting it to harmonize with the corresponding provision in the October 2015 written warning – that the term "care check" "includes" (i.e., encompasses) "overnight oximetries," among other events. And in deciding a Rule 12(b)(6) motion to dismiss, allegations are to be construed in favor of the non-movant.

Lincare also argues that Blankenship's argument "conflat[es] two separate services, 'overnight oximetry pickups' and 'overnight oximetries.' " (Doc. 32, PageID.184). However, Lincare points to no allegations in the amended complaint to support its argument that the two services are different, nor has it presented any supporting evidence. A "sentence in an unsworn brief is not evidence." *Travaglio v. Am. Exp. Co.*, 735 F.3d 1266, 1269 (11th Cir. 2013) and, absent any indication that Lincare actually possesses evidence that could validly be considered in the Rule 12(b)(6) context, the Court must accept the allegations in the amended complaint as true.

Because the well-pleaded allegations in the amended complaint, accepted as true and construed in the light most favorable to Blankenship, do not support Lincare's argument that her February 2016 work productivity level constitutes an "intervening act of misconduct" that breaks the causal chain between protected activities and her termination, Lincare's motion to dismiss is due to be **DENIED** as to Count III.[16]

### d.    Leave to Amend

Lincare's motion to dismiss also requests that Blankenship not be granted further leave amend her complaint prior to dismissal of her claims. In response, Blankenship conclusorily requests, in a sentence at the end of her brief, that she be allowed "an opportunity to file an amended complaint to address any deficiencies in her Amended Complaint identified by this Court." (Doc. 30, PageID.170).

Eleventh Circuit caselaw is clear that, "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999) (per curiam). Instead, "[f]iling a motion is the proper method to request leave to

---

[16] That said, the undersigned rejects as unpersuasive Blankenship's alternative argument that *Henderson*, *Hankins*, and their progeny stand for the proposition that an act of misconduct must rise to a certain level of severity in order to constitute an "intervening act," as she points to nothing in those cases convincingly indicating that their relevant holdings were so qualified. Regardless, the "intervening acts" in *Henderson* and *Hankins* were, like the misconduct claimed here, at bottom failures to follow written workplace rules. In *Hankins*, the "intervening act" was yelling at and threatening a co-worker, which was "plainly in violation of Rules 1 and 14 of [the employer's] Crew Member Handbook…" 237 F. App'x at 520-21. In *Henderson*, the "intervening act" was the plaintiff's "falsification of his time card," a "terminable offense" under the employer's "Acceptable Conduct Policy." 442 F. App'x at 504, 507.

amend a complaint[, and a] motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (per curiam). Blankenship has done neither, and the Eleventh Circuit has upheld a district court's denial of leave to amend where, as here, "[t]he request for leave to amend was included in the memorandum … filed in opposition to the motion to dismiss[,]" the memorandum "failed to attach the amendment or set forth the substance of the proposed amendment[,]" and the "plaintiff had ample time to file a motion for leave to amend but failed to do so." *Id.* at 1280-81.[17] Coupled with the fact that Blankenship has already amended her complaint once as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B) in an unsuccessful attempt to stave off dismissal of Counts I and II, Blankenship's complete failure to explain any additional proposed amendment that could save her FCA fraud claims should not be excused. Accordingly, the undersigned will recommend that Lincare's request to deny further

---

[17] *Accord, e.g.*, *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009); *My24HourNews.com, Inc. v. AT&T Corp.*, 791 F. App'x 788, 803 (11th Cir. 2019) (per curiam) (unpublished) ("[R]ather than file a motion for leave to amend, My24 included its request in the memorandum filed in opposition to AT&T's motion to dismiss. Even assuming that request was the functional equivalent of a motion, My24 failed to attach the proposed amendment or set forth the substance of the proposed amendment, as required by *Long* … My24 simply requested 'leave to amend to cure any defects.' That is not enough, and the district court acted within its discretion by denying the embedded request for amendment."); *Avena v. Imperial Salon & Spa, Inc.*, 740 F. App'x 679, 683 (11th Cir. 2018) (per curiam) (unpublished) ("Here, the only request Avena made for leave to file an amended complaint prior to the district court's dismissal of her complaint was a single line at the end of her motion in opposition to Imperial's motion to dismiss. This request was improper because it neither contained a proposed amendment, nor did it elaborate on the substance of the proposed amendment.").

leave to amend the complaint be **GRANTED**, and that Blankenship's request for leave to amend embedded within her response brief be **DENIED**

## V.    *Conclusion & Recommendations*

In accordance with the foregoing analysis, and pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72(b)(1), and S.D. Ala. GenLR 72(a)(2)(S), the undersigned **RECOMMENDS** to the Court as follows:

1. that Lincare's motion to dismiss the amended complaint under Rule 12(b)(6) (Doc. 25) be **GRANTED** as to the FCA fraud claims in Counts I and II, be also **GRANTED** as to denial of further leave to amend Counts I and II, and be **DENIED** as to Count III;

2. that Blankenship's request for leave to further amend her complaint, embedded within her response brief, be **DENIED**; and

3. that Counts I and II be **DISMISSED** under Rule 12(b)(6) **with prejudice** as to Blankenship, but **without prejudice** as to the government.[18]

**DONE** this the 29th day of January 2021.

/s/ Katherine P. Nelson.
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

---

[18] *See Urquilla-Diaz*, 780 F.3d at 1057 (in affirming the dismissal of relator's claims with prejudice, noting that the court "need not decide whether a Rule 12(b)(6) dismissal precludes the government (or another relator) from bringing a False Claims Act action against a defendant, especially where the government did not intervene at any stage in the proceedings," but nevertheless "modify[ing] the judgment of dismissal to be without prejudice to the government").

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within 14 days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.